UNITED STATES BANKRUPTCY COURT
DISTRICT OF NORTH DAKOTA

In re:                                                                  Bankruptcy No. 06-30523
                                                                        Chapter 7
James Wolf and Mary Pat Mullen,

                Debtors.
_____/                                    Adversary No. 07-7011
Kip M. Kaler as Bankruptcy Trustee,

                Plaintiff,

   vs.

James Wolf,

                Defendant.
_____/

**MEMORANDUM AND ORDER**

      By Complaint filed June 1, 2007, Kip M. Kaler, the Chapter 7 bankruptcy trustee in this case, initiated this adversary proceeding seeking a determination that the Debtor/Defendant James Wolf is not entitled to a discharge pursuant to 11 U.S.C. § 727 (a)(2), (3) and (4). Defendant filed an Answer on June 14, 2007, denying the allegations.

      The matter was tried on September 26, 2007. The following constitutes the Court's findings of fact and conclusions of law.

I.  FINDINGS OF FACT

      Debtors James Wolf and Mary Pat Mullen originally filed for bankruptcy protection under Chapter 13 of the Bankruptcy Code on October 17, 2006. Unable to continue under Chapter 13, Debtors filed a motion to convert to Chapter 7 on February 1, 2007. That motion was granted on February 2, 2007, and Kip Kaler was appointed the Chapter 7 trustee. Mary Pat Mullen is not a defendant in the present case.

A.  **In-Touch Phone Services, Inc.**

Defendant James Wolf was the principal owner of In-touch Phone Services, Inc. In-touch sold pre-paid phone cards to convenience stores, grocers and other retailers in North Dakota, South Dakota, Montana, Nebraska, Iowa, Minnesota and Wisconsin. While the exact ownership interests of In-touch prior to 2004 were not established at trial, it was established that in 2004 Defendant owned 75% of In-touch stock while Blair Sherman owned 13% and Vern Hauser owned 12%. Both Sherman and Hauser had worked for In-touch as employees before being allowed to buy into the company.

Toward the end of 2004 the relationship between Defendant, Sherman and Hauser began to deteriorate. Defendant testified that after becoming owners Sherman and Hauser no longer wanted to work hard. By 2006, Defendant was doing most of the work himself with a little help from his son, Jason Wolf.

The business of In-touch was travel intensive. To service his clients, Defendant traveled regularly to locations in all seven states where In-touch had vendors. Additionally, Defendant traveled to, among other destinations, Tucson, Arizona and Salt Lake City, Utah for trade shows. While traveling, Defendant often "wined and dined" existing and potential clients. This included eating, drinking and occasionally gambling.

In 2006, In-touch began experiencing financial problems. In addition to lagging profits, In-touch was embroiled in ongoing litigation with D&M Smith Enterprises. These two issues were the impetus for Defendant filing bankruptcy. Although business was not great, In-touch's 2006 tax return shows that it paid $48,600.00 in "compensation to officers." Defendant testified

that the entire amount was his salary. Currently, In-Touch is no longer operating, and its assets have been seized by Northland Financial.

B.   **Finances of Defendant**

Defendant's financial transactions from January 2006 until he and his wife filed for bankruptcy on October 17, 2006 are at issue in this case. When Defendant filed for bankruptcy he was making $1,630.00 bi-weekly ($48,600 per year) as an employee of In-touch. During September, October and November of 2006, Defendant received payments totaling $7,861.26 from In-touch in addition to his salary. Defendant testified these payments were payback for money that he had invested in the company and for reimbursement of mileage driven in June and July of 2006.

In addition to Defendant's salary, his wife and co-debtor, Mary Pat Mullen, received social security and worker's compensation payments. In 2001, Mullen was struck by a car while crossing a street. She sustained multiple injuries that caused her to be home-bound for over a year. Defendant testified that her most serious injury, a closed head injury, led her to be classified as permanently and totally disabled. In 2006, Mullen received $1,630.00 per month from social security and bi-weekly payments of $318.00 from worker's compensation. In 2006, Debtors' total monthly income was $5,526.00. In addition to themselves, Debtors were supporting three children in 2006.

At the beginning of 2006, Debtors' bills were beginning to overwhelm them and they could not pay them all. In an attempt to get their debt under control, Debtors moved out of their house and began renting an apartment in January 2006. Although they surrendered their home and no longer had to make monthly mortgage payments, Defendant testified that he had to make

a $5,000.00 lump sum payment to the second mortgagor before he relinquished the home. In addition to surrendering their home, Debtors sold land they owned outside of Fargo and took money from their 401k plans to pay creditors. Unfortunately, this was not enough, and Debtors had to resort to credit cards to pay bills.

With his credit cards maxed out and out-of-town motels and gas stations not accepting checks, Defendant had to take out large sums of cash to pay for his In-touch travels. Defendant either took money from the safe in his office or from ATMs while traveling. It was not atypical for Defendant to withdraw thousands of dollars in cash over a one-week period. Defendant testified that this money would be used for gas, lodging, his personal food and wining and dining clients. Defendant did not keep any documentation detailing these expenses.

Defendant's 2006 tax return for In-touch lists $8,184.00 for travel and entertainment. Although this amount is considerably less than Defendant's total cash withdrawals during 2006, Defendant testified that this amount did not include all of his travel and entertainment. At times, In-touch had no money to reimburse Defendant for his travel costs so he saw no reason to submit them.

In addition to his business travels Defendant used cash to pay for his daily living expenses. Defendant used cash to pay for rent, gas, clothes, money for his kids and other expenses. No receipts or other accounting were provided showing how much was spent in these areas. Upon review of Defendant's bank statements it appears that a large sum of money was spent on his personal entertainment. Defendant's bank statements show large sums of money withdrawn from ATMs at local bars and restaurants. Defendant was uncertain what this money

was used for but assumed it was for food, drinks and gambling. Defendant testified that during 2006 he probably lost a couple thousand dollars gambling.

## II. CONCLUSIONS OF LAW

The trustee seeks to have Defendant denied a discharge under 11 U.S.C. § 727(a)(2), (3) and (4). Section 727(a) provides in relevant part:

(a) The court shall grant the debtor a discharge, unless—

\* \* \*

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition;

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

(B) presented or used a false claim;

(C) gave, offered, received or attempted to obtain money, property, or advantage, or a promise of money, property or advantage, for acting or forbearing to act; or

(D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

5

11 U.S.C. § 727(a).

     Denying a debtor a discharge is a drastic remedy.  Kaler v. Geller (In re Geller), 314 B.R. 800, 806 (Bankr. D.N.D. 2004).  In light of the policy implications favoring debtors under the Bankruptcy Code, section 727 must be construed liberally in favor of the debtor and strictly against the objecting party with the burden of proof resting squarely upon the latter.  Id.  The standard of proof is a preponderance of the evidence.  Id.

     A debtor may be denied a discharge pursuant to section 727(a)(3) for failure to keep or preserve records from which his financial situation may be ascertained unless the failure is justified under all the circumstances of the case.  Riley v. Riley (In re Riley), 305 B.R. 873, 882 (W.D. Mo. 2004).  Debtors are required to keep adequate financial records to enable parties and the court to trace the debtor's financial history, reconstruct financial transactions, and test the completeness of the disclosure requirements.  Fokkena v. Huynh (In re Huynh), 368 B.R. 838, 843 (Bankr. D. Minn. 2007).  Intent is not an element of this ground for denial of discharge; the standard imposed is one of reasonableness.  In re Riley, 305 B.R. at 882.  Discharge should not be denied if the debtor's records, though poorly organized, are reasonably sufficient to ascertain the debtor's financial condition.  Id.  Although the Bankruptcy Code does not require an impeccable system of bookkeeping, the records must sufficiently identify the transactions so that intelligent inquiry can be made of them.  Grisham Farm Products, Inc. v. Keller (In re Keller), 322 B.R. 127, 132 (Bankr. E.D. Ark. 2005).  The complaining party must make an initial showing that the debtor failed to maintain and preserve adequate records and that the failure makes it impossible to ascertain the debtor's financial condition and material business transactions.  Id.  If the debtor breaches his duty to his creditors to keep adequate records, he is

6

given the opportunity to provide some justification for the breach. Id.  If the debtor cannot justify his failure to keep adequate records, discharge will be denied.  Id.

In his Complaint, the trustee alleges that Defendant failed to maintain adequate records showing how $65,000.00[1] in cash was spent from January 2006, until October 17, 2006, the date Defendant filed for bankruptcy.  In order to help him understand where the money went, Trustee Kaler sent Defendant a letter on April 16, 2007, asking Defendant to explain how the money was spent.  Defendant responded to Trustee Kaler's request on August 16, 2007, and this response was submitted to the Court as Exhibit No. 8.  In addition to Defendant's explanations, Exhibit No. 8 contains financial statements and records of Defendant's cash withdrawals along with copies of checks written by Defendant and a mileage log kept by Defendant in the course of his business travels.  Exhibit No. 8 details 75 ATM withdrawals totaling $16,869.25; 35 checks written out to "Cash" or "James Wolf" totaling $27,100.00; and Smart Check purchases at casinos for cash totaling $10,334.96.  The explanations provided by Defendant were very minimal.  For instance, for the week of June 25 through July 1, 2006, Defendant withdrew $2,700.00.  His entire explanation for where $2,700.00 went is, "6-27 Jamestown gas 216 miles." Defendant maintained no documentation, e.g., hotel receipts, restaurant receipts, gas station receipts, on where, or if, he spent this money.  This typifies Defendant's explanation to the trustee as to how he spent $50,000.00 in cash over nine months.  Excluding the mileage log,

---

[1] During his closing argument, the trustee agreed that some explanation was provided for where the money went, but argued that $50,000.00 was still unaccounted for.  The trustee, however, did not state with specificity what expenses he thought were explained.

7

which according to Defendant would account for $7,300.00$^2$, Defendant maintained no other documentation as to where and how the remaining cash was spent.

Defendant testified that he had to use cash during his business travels because his credit cards were all maxed out and he did not keep his receipts. The Court is sympathetic to the Defendant's situation. In today's world, more and more retailers do not accept checks and require payment by cash or credit card. With his cards maxed out, cash was Defendant's only form of payment. The Court, however, can only be sympathetic to a certain degree. With the evidence and testimony provided, the trustee and the Court are left to guess how Defendant spent $50,000 in cash. Defendant had the opportunity to explain how often he traveled and what the cost of gas was for each trip, what hotels he stayed at and how much each night cost, what restaurants he ate at and how many customers he wined and dined, etc. He failed to do this. On several occasions during his testimony Defendant, when asked where a specific withdrawal was spent, said something to the effect of, "I assume it was for food and lodging" or "I guess I used it for travel expenses." Assumptions and guesses are not legitimate explanations.

Additionally, Defendant testified that some of the cash was spent on rent, clothes and food for his family, entertainment, and other expenses. Not only was he again unable to provide any receipts for the cash used for personal expenses, but his testimony was also exceedingly vague and it failed to identify with any specificity how much cash he spent on each of these various expenses.

---

[2] It is unclear whether the $7,300.00 is one of the expenses Trustee Kaler deducted from his original $65,000.00 claim or whether this would be deducted from the $50,000.00 that the trustee believes is still unexplained.

When using cash, it is particularly important for debtors to keep documentation of their transactions. Without documentation, trustees are unable to trace a debtor's financial history or reconstruct their financial transactions. In this particular case the Court does not believe that Defendant intended to hinder the trustee's efforts, but it is unreasonable that Defendant cannot provide any documentation or sufficiently detailed explanations showing how $50,000.00 was spent. Therefore, the Court finds that the trustee has met his burden of proving that Defendant failed to keep adequate records from which Defendant's financial condition could be ascertained.

Because the trustee has met his burden of proof, the burden shifts to Defendant to offer some justification for his failure to keep adequate records. Floret, L.L.C. v. Sendecky, (In re Sendecky), 283 B.R. 760, 764 (B.A.P. 8th Cir. 2002). In order to determine if that failure was justified, the Court must first determine what records someone in like circumstances would keep. Id. Although no evidence was presented regarding Defendant's education or business experience prior to his involvement with In-touch, Defendant struck the Court as an intelligent and savvy businessman who happened to run into a bad business environment. Defendant, for many years, ran a successful company which operated in seven states. The Court would expect, if for no other reason than having the information available for tax preparation, that an experienced businessman with the sophistication to run a multi-state operation would keep some record of his expenditures. Further, the Court would expect that some documentation would exist for personal expenses such as apartment rent and car payments. Defendant did not explain his failure to keep records to the Court's satisfaction.

Based on the foregoing, Defendant James Wolf is DENIED a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(3) and it is unnecessary for the court to discuss 11 U.S.C. § 727(a)(2) and (4).

**SO ORDERED.**

Dated this 22nd day of October, 2007.

**WILLIAM A. HILL, JUDGE
U.S. BANKRUPTCY COURT**